**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL McCARTHY,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **INTERNATIONAL ASSOCIATION,** | : | |
| **OF MACHINISTS AND** | : | |
| **AEROSPACE WORKERS,** *et al.*, | : | **No. 19-5727** |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                                    **March 8, 2021**

This case involves a nasty union spat between Michael McCarthy, who was once an elected district lodge general chairman, and Michael Perry, who is the current president and directing general chairman of one of the district lodges of the International Association of Machinists and Aerospace Workers ("IAM" or "the Union"). Shortly after McCarthy was elected in 2019, Perry filed charges against him for alleged poor job performance in his role as general chairman. McCarthy vehemently disputes all of the charges levied against him. A trial was conducted pursuant to the IAM's constitution. Ultimately, McCarthy was found guilty of most of the charges levied against him and was removed from his position. Essentially, he wants this Court to overturn that decision, though he claims that his Complaint is an attempt to vindicate his right to free speech and the right of the IAM members, including Plaintiff Robert Eddis, a member of the union who voted for McCarthy, to vote in union elections. Both of these rights are guaranteed by the Labor Management Reporting and Disclosure Act ("LMRDA").

Both parties have filed summary judgment motions. Upon review of the record, the Court concludes that Defendants' motion will be granted, and Plaintiffs' motion will be denied.

1

I.      **FACTUAL BACKGROUND**

A.      **The Union and McCarthy's Role in the Union**

IAM is an international labor organization that represents hundreds of thousands of railroad, airline, aerospace, and manufacturing workers. (Mem. in Supp. of Defs.' Mot. for Summ. J. [Def.'s Mem.] at 4.) The Union has about 500 local lodges, which are affiliated with about thirty-five intermediate level district lodges. (*Id*.) Every four years, the thirteen general chairs of the district lodges are elected by the Union's members. (*Id*. at 5.) Perry, as district lodge president, has the authority to "direct and assign the duly elected General Chairmen." (Defs.' Mot. for Summ. J. Ex. C [District Lodge 19 Bylaws].)

The IAM constitution provides that incompetence, negligence, or insubordination in the performance of one's official duties, as well as the failure or refusal to perform duties validly assigned may result in a reprimand, removal from office, or other punishment. (*Id*. Ex. B. [IAM constitution].) The IAM constitution states that "[a] charge of misconduct may be made against any officer or representative of a L.L., D.L., council or conference, by any member in writing within 30 days after knowledge of the most recent charged incident to the proper officer of the body involved with a copy of such charges to the I.P." (*Id*.)

If charges are filed, the IAM international president may decide that an investigation and trial before a special committee is warranted. (*Id*.) If a trial is conducted, the trial committee will report its verdict and recommended penalty in writing to the international president, who may "affirm, modify or reverse in full or in part, the decision of the special trial committee, or impose any penalty or fine, which he/she deems to be appropriate." (*Id*.) The IAM constitution allows for further review by the IAM executive council and, if necessary, the IAM convention. (*Id*.)

In 2012, McCarthy was appointed as a general chairman of District 19 by the District's then-president, Jeff Doerr (Pls.' Statement of Undisputed Facts [Pls.' SOF] ¶ 2.) He was elected as a general chairman of District 19 in 2015 and again in June of 2019. (*Id.* ¶ 3.) McCarthy claims that his position in the Union afforded him "a numerically large and geographically vast membership." (Pls.' SOF ¶ 14.) Defendants, however, dispute McCarthy's characterization of his influence. (Defs.' Resp. to Pls.' SOF ¶ 14.) In 2016, "defendant sought to remove [Doerr] by means of an Article L trial." (Pls.' SOF ¶ 5.) According to McCarthy, he was pressured to sign a petition to remove Doerr, but he initially refused. (*Id.* ¶¶ 6-7.) McCarthy asserts that because of his refusal, he was reprimanded by Brian Orwan, the assistant to the District 19 president. (*Id.* ¶¶ 8-9.) Defendants dispute that the purpose of the meeting was to reprimand McCarthy; they claim the meeting was held to discuss various deficiencies in McCarthy's performance. (Resp. to Pls.' Statement of Undisputed Facts [Defs.' Resp. to Pls.' SOF] ¶¶ 8-9.)

According to Perry, he received reports from members and representatives in the field complaining about McCarthy's job performance. (Defs.' Mot. for Summ. J. Ex. A [Perry Decl.] ¶ 6.) Perry initiated an investigation and based on the results of that investigation; Perry concluded that McCarthy had been negligent in representing the Union's members. (*Id.* ¶¶ 6-9; *see also* Pls.' Opp'n Ex. D [Perry Dep.] at 35-36, 44-47, 51-54, 61-64.) In July of 2019, Perry relieved McCarthy of his duties at Amtrak's Wilmington, Delaware shops, and appointed himself to the role. (Pls.' SOF ¶¶ 19-20.) On October 2, 2019, Perry summoned McCarthy to a meeting to be held on October 7, 2019, during which Perry confronted McCarthy and read from a prepared script the numerous complaints that Perry had received about McCarthy's representation. (*Id.* ¶¶ 23-24.) During this meeting, Perry offered McCarthy the opportunity to resign and informed him that he would pursue charges if he did not resign. (*Id.* ¶ 25.) According to McCarthy, Perry told him, "You

were never on my team now I'm making if official." (*Id.* ¶ 27.) McCarthy did not resign. (*Id.* ¶ 28.) On October 11, 2019, Perry informed McCarthy that he was being relieved of his present assignments and was being reassigned to his home point. (Pls.' SOF ¶ 29; Defs.' Mot. for Summ. J. Ex. G [Oct. 11, 2019 Letter].)

 **B.**  **The Charges and McCarthy's Response**

On October 14, 2019, Perry filed five charges against McCarthy pursuant to the IAM constitution. (Defs.' Mot. for Summ. J. Ex. H [Charging Letter].) Specifically, Perry's charges revolved around five different incidents. First, Perry acted negligently and/or incompetently while representing union members at the Wilmington, Delaware shops. (*Id.*) Perry referenced a unilateral reduction in wages by Amtrak and believed that McCarthy "failed or refused to represent" the members through an "unprecedented and humiliating interview process where 25 of our members were called in one-by-one to meet with management and forced to unnecessarily recant their statements without any guidance or representations from Brother McCarthy." (*Id.*) He failed to notify Perry or outside counsel about what was happening, and he left the members subject to discipline. (*Id.*) McCarthy also failed to process a member's grievance, and severely weakened an arbitration case between the Union and Amtrak. (*Id.*) McCarthy also visited the shop to attend a retirement luncheon without authorization and "chose to interject himself back into the ongoing rate dispute, in which he had no authority to do so. His action severely damaged the credibility and integrity of the local chairman and [Perry]." (*Id.*)

Second, McCarthy failed to process a grievance sent to him by a local lodge. (*Id.*) The grievance had been filed on the local level and forwarded to McCarthy for further processing. (*Id.*) When Perry followed up with McCarthy, McCarthy stated that "he told them they didn't have a grievance but would monitor it." (*Id.*)

Third, McCarthy signed a collective bargaining agreement for members employed by the Kansas and Oklahoma Railroad that failed to include any premium pay of overtime work, which is expected in railroad industry contracts. (*Id.*) This failure "seriously weakened [the Union's] ability to grow [Union] membership and to negotiate a fair and equitable agreement in this round of bargaining." (*Id.*)

Fourth, McCarthy failed to inform local lodge officers and members of the National Freight Agreement survey as Perry had instructed. (*Id.*) Finally, McCarthy improperly expensed per diems and mileage. (*Id.*) As a result of these charges, Perry accused McCarthy of incompetence, negligence, or insubordination; Perry requested an Article L trial for McCarthy and "should he be found guilty, his removal from office and his disqualification from holding office within the IAM for up to 5 years." (*Id.*)

McCarthy claims that these charges against him were baseless and stemmed from Perry's desire to remove him from his position with the Union. For example, McCarthy claims that he did nothing wrong with respect to his handling of the Wilmington, Delaware shop dispute. The Parties agree that Amtrak and the Union had a dispute over the applicable pay rate at the Wilmington shops. (Pls.' SOF ¶ 36.) Amtrak and the Union agreed to arbitrate the dispute, and lawyers for the Union investigated historic pay rates at the shop. (*Id.* ¶¶ 43, 45.) Statements were prepared and distributed for union machinists to attest to their historic pay rates. (*Id.* ¶¶ 45-47.) When Amtrak investigated the statements of the machinists, it determined that a number of the statements were factually incorrect. (*Id.* ¶¶ 49-52.) Amtrak brought these employees into one-on-one meetings and threatened them with discipline for the false statements. (*Id.* ¶ 53.) Subsequently, the employees recanted their statements. (*Id.* ¶ 55.) McCarthy believes that he handled the issue appropriately and protected the employees; Defendants contest this belief. (*See* Defs.' Resp. to Pls.' SOF ¶¶ 63-77.)

5

McCarthy also takes issue with Perry's take on the retirement party that McCarthy attended. The Parties dispute whether Perry ordered McCarthy not to visit the Wilmington shops without prior authorization. (Defs.' Resp. to Pls.' SOF ¶¶ 89-90.) McCarthy also disputes that he improperly handled a grievance at the Wilmington shops. (*Id*. ¶¶ 93-113.)

McCarthy asserts that he handled the local lodge grievance properly, as well as the Kansas and Oklahoma Railroad contract, which he played only a minor and incidental role in negotiating. (*Id*. ¶¶ 114-42.) McCarthy also claims that he spoke with membership about the National Freight Survey. (*Id*. ¶ 146.) Finally, McCarthy denied improperly expensing per diems. (*Id*. ¶¶ 148-54.)

Robert Martinez, the IAM international president, determined that these charges would be heard by a Special Trial Committee ("STC"). (Defs.' Mot. for Summ. J. Ex. I [Nov. 4, 2019 Martinez Letter]. On February 11, 2020, a trial was held. (Defs.' Mem. at 7.) The STC issued its final report on March 1, 2020, finding McCarthy guilty of four of the five charges. First, the STC determined that McCarthy was negligent in handling the Wilmington, Delaware shop as "[t]he basic level of representation is clearly lacking." (Defs.' Mot. for Summ. J. Ex. L [STC Findings]. The STC blamed McCarthy for the wage reduction issues and subsequent errors that cost the Union significant dues money and "put his members in harm's way and caused much angst and ill will." (*Id*.) The STC also concluded that McCarthy failed to correctly appeal multiple grievances and ignored Perry's direct order not to visit the property. (*Id*.)

Second, with respect to McCarthy's failure to process a grievance sent to him by a local lodge, the STC concluded that "[t]he evidence to support this charge is substantial and the testimony . . . is compelling." (*Id*.) The STC deemed McCarthy's failure in this area to be serious and rejected his explanation for his actions. (*Id*.)

As for the third charge, related to the collective bargaining agreement at the Kansas and Oklahoma Railroad, the STC found McCarthy guilty of this charge due to "compelling" testimony that members "were so poorly represented by Brother McCarthy and how desperate he made them feel." (*Id.*) The STC deemed McCarthy's failure to include overtime, to consult with lawyers, and to protect members against contractors "inexcusable." (*Id.*)

The STC also found McCarthy guilty of charge four because of evidence that he had misled members about the national survey. (*Id.*) The evidence made it "very clear that Brother McCarthy misled [the local membership] about the National Survey." (*Id.*) Finally, the STC found that McCarthy was not guilty of impropriety with respect to per diems and mileage because of a lack of evidence. (*Id.*)

As a result of these findings, the STC recommended that McCarthy be removed from office and disqualified from holding office for five years. (*Id.*) On March 16, 2020, Martinez, the international president of the Union, affirmed the STC's findings and adopted its recommended penalty. (Defs.' Mot. for Summ. J. Ex. M [Mar. 16, 2020 Martinez Letter].) McCarthy appealed the decision to the IAM Executive Council, which affirmed the STC's recommendation and Martinez's decision. (*Id.* Exs. N [Appeal] & P [Denial of Appeal].) The Executive Council concluded that the evidence "clearly supported the four charges at issue and revealed a troubling pattern of negligent conduct and indifference to the legitimate rights and concerns of IAM members by [McCarthy]." (Denial of Appeal.) His actions "did substantial harm to [IAM] members and to their confidence in the IAM. Finally, [McCarthy's] misconduct unnecessarily exposed this union to potential legal liability for violation of the duty of fair representation." (*Id.*)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party can demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to decide in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

## III.    DISCUSSION

Plaintiffs' claims rely on two provisions of the LMRDA. First, Plaintiffs claim that Union members have been denied "equal rights and privileges . . . to nominate candidates, to vote in elections or referendums of the labor organization . . . subject to reasonable rules and regulations in such organization's constitutions and bylaws." 29 U.S.C. § 411(a)(1). Second, Union members were denied their right "to express any views, arguments, or opinions . . . Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable

rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2).

### A.      Right to Vote

McCarthy argues that his removal denied his supporters a meaningful right to vote. (Pls.' Mem. at 30-31; Pls.' Opp'n at 6-10.) Plaintiffs suggest that the Union's members were denied the right to vote because McCarthy was stripped of his assignments. (Pls.' Opp'n at 6.) Thus, the election was a sham and McCarthy did not actually represent any members. (*Id*.) Moreover, Perry's application of the Union's rules that were used to remove McCarthy was unreasonable because Perry lacked any factual basis for the charges Perry brought against McCarthy. (Pls.' Mem. at 31-32.) Because the Court concludes that union members were not denied the right to vote, the Court will grant Defendants summary judgment on this claim. Moreover, the Court concludes that Perry's charges had a factual basis.

Plaintiffs claim that Defendants violated the LMRDA's directive that "[e]very member of a labor organization shall have equal rights and privileges within such organization . . . to vote in elections." *See* 29 U.S.C. § 411 (a)(1). Plaintiffs rely largely on two union voting cases to support the argument that the voting rights of members were unreasonably infringed upon.

The first case is *Bunz v. Moving Picture Machine Operators' Protective Local Union 224*, 567 F.2d 1117 (D.C. Cir. 1977). *Bunz* asked whether "the federal courts have jurisdiction of a union member's claim that he was denied the 'equal right to vote' guaranteed by the [LMRDA] when his union conducted a referendum in plain disregard of its by-laws." *Bunz*, 567 F.2d at 1118-19. In *Bunz*, the officers of the union sought to assess a fine on members who did not walk the picket line. The union's by-laws required that assessments be approved by two-thirds of the

members present. However, the union's lawyers decided that the assessment passed despite approval by fifty-nine percent of the members present. *Id.* at 1119. The D.C. Circuit concluded that the district court had subject matter jurisdiction over Bunz's lawsuit. The court noted that the right to vote included more than the right to merely cast a ballot; the right also prevented serious discrimination, irregularities, or foul play at any stage of the electoral process. *Id.* at 1121-22. The court upheld the decision of the district court that Bunz had been denied the equal right to cast a meaningful vote because the union has issued a "patently frivolous interpretation of its constitution" when it changed the percentage of votes needed to defeat an assessment. *Id.* at 1122.

The facts of *Bunz* look nothing like those presented here. Here, there is no evidence of any irregularities with any vote or any actions taken by the Union or by Perry that nullified the election of McCarthy or changed any of the rules involving McCarthy's election. Indeed, McCarthy was elected and installed to the position he won. The vote was completed and there is no evidence that it was interfered with. Perry's initial decision to reassign McCarthy did not nullify the vote; McCarthy was reassigned as the Union's by-laws permit. (District Lodge 19 Bylaws ("The President of the District Lodge shall . . . direct and assign the duly elected General Chairman.").) It was only after a full trial and appeal that McCarthy was removed from his position. And that decision is clearly supported by the record before this Court.

The next case on which Plaintiffs rely, *Blanchard v. Johnson*, addressed whether to enjoin a referendum that would have led to a local union affiliating with the International Longshoreman's Association. 388 F. Supp. 208, 210 (N.D. Ohio 1975). The local union was disaffiliating with the International Organization of Masters, Mates and Pilots and was receiving inquiries from other organizations about possible affiliations. *Id.* at 212. The local union adopted a resolution that affiliation proposals would be submitted to the membership for ratification or

rejection by secret ballot. *Id*. Although numerous proposals were received, the only proposal submitted for a vote was from the International Longshoreman's Association. *Id*. at 214.

The court concluded that the members had been deprived of a right to a meaningful vote as provided by the LMRDA when the members were kept in the dark on the affiliation proposals. *Id*. The right to vote was not meaningful if union members were kept in the dark about pertinent, relevant information. *Id*. Moreover, the local union's constitution demanded that union leaders share the information with their members. *Id*.

The facts of *Blanchard* are not similar to those presented here. Union members were not kept in the dark about a topic upon which they clearly had a right to be informed. In *Blanchard*, the union ignored a clear directive to submit affiliation proposals to the membership. Here, Perry was authorized to alter McCarthy's assignments, and the Union was authorized to try and discipline McCarthy. Moreover, none of these actions interfered with the rights of the Union's members to vote in a meaningful way. There is no evidence in the record to support the conjecture that Perry's intention was to overturn McCarthy's election and that Perry's method of choice for carrying out this plan to nullify the votes of union members was to use an STC and the IAM's international president

The LMRDA's right to vote provision "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Calhoon v. Harvey*, 379 U.S. 134, 139 (1964); *see also Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477, 493 (W.D. Pa. 2013) (dismissing LMRDA voting claim for failing to allege discrimination of the right to nominate or vote for candidates or issues). Plaintiffs have failed to raise a genuine issue of material fact as to whether any Union members were discriminated against in exercising their voting rights here.

One final issue must be addressed about the right to vote. Defendants claim that the decision of the STC and the international president and executive council should not be disturbed because there was "some evidence" to support the charges. (Defs.' Mem. at 13-14 (relying on *Int'l Bhd. Of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman*, 401 U.S. 233, 246-47 (1971).) This standard ensures that unions can govern their own affairs without court interference. *Id*. If there is evidence to support the union tribunal's findings and the union adhered to procedural due process, the decision of the tribunal must be upheld. *Lewis v. AFSCME*, 407 F.2d 1185, 1198 (3d Cir. 1969).

Plaintiffs do not directly respond to this argument regarding this legal standard, presumably because they insist that the charges were bogus from their inception, and therefore, the case never should have moved to an Article L trial and thus, the findings of the STC "are irrelevant to McCarthy's case, and offer defendants no sanctuary." (Pls.' Opp'n at 2-3.) According to Plaintiffs, their LMRDA voting rights claim "is based on what Perry knew and did when he removed McCarthy and issued the charging letter, not on what an internal union committee determined later at McCarthy's trial." (*Id*. at 8.) Thus, the STC's findings "are immaterial to the question of the reasonableness of the charges." (*Id*.)

The Court cannot agree with Plaintiff's reasoning. Their reasoning seems to be based on an unsupported assertion that Perry made up charges and that the STC, the international president, and the executive council simply rubber-stamped Perry's allegations. But there is zero evidence to support such speculation. And if there is evidence in the record to support the findings of the STC, how can this Court conclude as a matter of law that those charges were unreasonable from their inception? The record supports a finding that the charges were reasonable and there is no basis to conclude that Defendants violated the rights of union members to vote. The STC heard testimony

12

from numerous individuals and considered documentary evidence from various sources. Yet there is simply no evidence that Defendants interfered with member's voting rights. The election took place as expected on June 14, 2019, and there is no evidence of any attempt to subvert the election. Indeed, McCarthy was elected. The election was not nullified simply because McCarthy was reasonably disciplined and subsequently removed in October.

Additionally, the Court is somewhat baffled by McCarthy's position that the findings of his own Union are irrelevant when he spends a significant chunk of his legal memorandums attacking the very facts upon which the findings relied. He spins a tale that questions virtually everything the STC concludes yet insists that the findings do not matter to his claims. The Court fails to see the logic in McCarthy's argument and sees no reason to reject the outcome of the Union's internal tribunal process.

Because the record lacks evidence that Defendants interfered with Plaintiffs' rights to vote, the Court grants summary judgment on this claim.

### B.      Right to Free Speech

McCarthy asserts that the baseless charges against him constitute retaliation for his views and opinions regarding the discipline of Doerr.

The LMRDA protects the rights of union members to "express any views, arguments, or opinions" although the law also ensures that the union can issue and enforce reasonable rules "as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2). To succeed on an LMRDA free speech claim, the member must establish: (1) he engaged in protected expression; (2) he was subjected to an adverse action reasonably likely to deter future expression; and (3) that action was caused by the protected expression. *Marshall v.*

*Local 701 Int'l Bhd. Of Elec. Workers*, 387 F. App'x 623, 627-28 (7th Cir. 2010); *see also Doyle v. United Auto. Aerospace & Agric. Implement Workers of Am., Local 1069*, 761 F. App'x 136, 138 (3d Cir. 2019). A plaintiff must prove the protected expression was a "but-for cause" of the adverse action. *See Serafinn v. Local 722, Int'l Bhd. Of Teamsters*, 597 F.3d 908, 914-15 (7th Cir. 2010).

As an initial matter, the Court struggles to conclude exactly what speech McCarthy engaged in that led to the alleged retaliation. The only "speech" identified is McCarthy's reluctance to sign a petition to remove District Lodge President Doerr. But there is no indication that McCarthy spoke in favor of Doerr, or in any way publicly supported Doerr. Rather, he refused to sign a petition to remove Doerr when the request was initially made. McCarthy believed that Doerr should receive due process before he was removed from his position. And not only did McCarthy eventually support charges against Doerr, but a formal trial against Doerr—the very process which McCarthy sought—was eventually conducted. Furthermore, McCarthy reports that he was admonished by Orwan that it was too late, and that McCarthy would have to learn to do as he was told, not what he wanted to do. But he reports no interaction with Perry about the Doerr situation. Other than this initial reluctance to sign a petition, McCarthy does not point to any disagreement that he had with the Union or its leaders. The Court does not believe that McCarthy's initial reluctance to sign a letter in this case constitutes protected speech.

McCarthy's free speech claim suffers from another weakness: he has not shown that the purported adverse action he suffered in 2019 was caused by his refusal to sign the petition to remove Doerr. For McCarthy to demonstrate that retaliation was a "but for" cause of the adverse action, he may show either unusually suggestive timing between the protected activity and the alleged retaliation or a pattern of antagonism coupled with timing. *See Lauren W. ex rel. Jean W.*

14

*v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). He can show neither. There is simply no basis in the record to conclude that  the initial refusal to sign a letter to remove Doerr in 2016 was the reason for any adverse action in 2019.

The timing here is not suggestive of retaliation. Even assuming McCarthy engaged in protected speech, that speech occurred in 2016, when he refused to immediately sign the petition to remove Doerr. Perry did not strip McCarthy of his Amtrak assignment until June of 2019 and did not institute charges against him until October of 2019. Such a significant period of time is not indicative of retaliation. *See Doyle v. United Auto., Aerospace & Agric. Implement Workers of Am., Local 1069*, Civ. A. No. 11-6185, slip. op. at 13 (E.D. Pa. Mar. 30, 2018) (concluding that 18-month gap was not evidence of retaliation). McCarthy argues that this is a "first opportunity case" because Perry had no opportunity to retaliate against him until 2019. (Pls.' Opp'n at 23.) But McCarthy has no evidence that Perry kept this retaliation in his back pocket for multiple years only to implement it once McCarthy was reelected. There is no evidence of Perry's plan, no evidence that he was lying in wait for years, and no evidence that he enlisted an STC or the IAM international president to follow through with Perry's purported plan. It is all just McCarthy's speculation that Perry was quite displeased when McCarthy failed to sign the petition, but that McCarthy was untouchable for a period of time. There is also no evidence that Perry waited "because he needed McCarthy to get an overwhelming victory for his team." (*Id.*)

Nor is there evidence of actual antagonistic conduct in the interim period. Indeed, Perry and McCarthy ran on the same slate and were elected together to their respective positions in 2019. Finally, despite his initial refusal to sign the petition to remove Doerr, McCarthy later sent a letter supporting Doerr's removal, which undermines any argument that Perry would retaliate against him for his initial refusal to sign the petition. Finally, even if there were any slight animus by Perry,

this does not establish continuing hostility by the Union sufficient to make out retaliation. *Doyle*, Civ. A. No. 11-6185, slip. op. at 14. Not all disagreements between union members that result in discipline ripen into claims under the LMRDA.

McCarthy's free speech claim also relies on the premise that because he acted appropriately, there never should have been charges brought against him and he never would have faced an Article L trial or any punishment. (Pls.' Opp'n at 12.) But the Court has already addressed this argument at length. The Court does not agree with McCarthy's premise, however. The charges brought were reasonable and in accord with the Union's constitution and bylaws.

In sum, McCarthy's free speech claim fails because he has not proved his refusal to sign the petition to remove Doerr was the cause of the charges brought against him in 2019.

McCarthy also claims that his free speech was suppressed with his treatment regarding Amtrak's Wilmington, Delaware shops. McCarthy states that he was never barred from going to the shops and he was free to attend a retirement party at the Amtrak shops. He further claims that he has a free speech right, protected by the LMRDA, to "meet with any union member, anywhere, at any time and discuss anything he chooses." (Pls.' Mem. at 11.) But McCarthy cites no cases to support his belief in an unfettered right to say anything to anybody at any time. And of course, such an unchecked right does not exist. The very statute upon which McCarthy relies recognizes "the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2). The charge brought against McCarthy for ignoring Perry's direct order not to visit the Amtrak's Wilmington, Delaware shops is not an independent violation of McCarthy's free speech.

**IV.    CONCLUSION**

This is a nasty union battle which has spilled over into federal court. McCarthy has two problems here. First, despite significant opportunity for discovery, he has no evidence of the alleged multi-year conspiracy that involved Perry waiting until the perfect moment to remove McCarthy. Second, and relatedly from the Court's view, the STC, the international president, and the executive council all affirmed Perry's charges following a trial that examined the evidence and testimony supporting those charges. The record reveals no evidence that any Union member was denied their right to vote for McCarthy—who won his election—nor that McCarthy's free speech rights were abridged. Rather, McCarthy balked at signing a piece of paper and three years later he was removed from his position following a trial and appeal pursuant to the Union's constitution.

Because McCarthy has failed to create a genuine issue of material fact and Defendants are entitled to judgment as a matter law, the Court will grant Defendants' summary judgment motion, deny Plaintiffs' motion, and dismiss Plaintiffs' claims. An Order consistent with this Memorandum will de docketed separately.